# Anderson and Orne *v.* Lewis and Niles.

By the sixth article of the Chickasaw treaty, it is provided that a section of land within the territory, which was the principal subject of the treaty, should be reserved to each male and female of the Chickasaw tribe, not being the heads of families, who were of the age of twenty-one years and upwards. This treaty vests a right in the persons described to one section of land, and that right may be conveyed to a third party even before the land is located, if the conveyance is made according to the forms prescribed in the treaty.

It is now the well settled doctrine, that even a mere possibility, clothed with an interest in real estate, may be made the subject of contract, which a court of equity will inforce.

Where an Indian claiming a section of land under the Chickasaw treaty sold the same for a fair consideration, and the purchaser was prevented from perfecting his title, according to the form prescribed in the treaty, by the fraud of a third party, who obtained a deed to the same land with full knowledge of the previous sale; held, that this was a sufficient excuse for the failure of the first purchaser to perfect his title, and that a court of chancery would perfect the same.

Where individual rights vest under a treaty, the meaning of the treaty, in reference to them, is to be ascertained by the same rules of construction which we apply to the interpretation of private contracts.

The certificates required by the Chickasaw treaty to pass the title of an Indian to his reservation of land, are conditions subsequent. Where an estate is granted upon a condition subsequent, and that condition becomes impossible by inevitable accident, or the performance of it is prevented by the grantor, in both cases the estate granted becomes absolute and unconditional. The same rule applies to a third person by whose conduct the performance of the condition was prevented, and who is seeking to avail himself of the supposed divestiture of title.

The Chickasaw treaty requires that when an Indian sells his reservation, certain officers, appointed for that purpose under the treaty, shall certify that said Indian is competent to contract, and that a fair compensation has been paid him; whereupon the president shall approve the sale. Such a conveyance is *prima facie* evidence of a good title, but the same may be contested in a court of chancery and vitiated for fraud.

The acts of the officers who certify to the competency of the Indians to contract, &c. are purely ministerial, and partake no more of the character of a judicial sentence than the certificate of a clerk or justice of the peace of the acknowledgement of a

deed. Their duties bear no resemblance to those of commissioners appointed by Congress with full power, and for the express purpose of, deciding finally upon controversies between adverse claimants,

A deed takes effect by virtue of its delivery; and although it may have been in blank when signed, yet if filled up when delivered, it would be valid,—if it be in blank when delivered, that objection could only be taken by the grantor in the deed.

The facts of this case are sufficiently set forth in the opinion of the chancellor.

The CHANCELLOR.

The statements of the complainants' bill, so far as it is necessary to consider of them in disposing of the demurrer, are, that on the 7th of October, 1837, they purchased of an Indian woman, by the name of Ta-na-cha, a tract of land, being section 20, town. 3, range 2, west, which she claimed as a reservation, under the sixth article of the Chickasaw treaty of May, 1834. That on the 6th of October, 1837, one day preceding the purchase, said woman was enrolled and located on said section "by the agent and chiefs of the Chickasaw nation." That the secretary of war had so construed the treaty, that no deed would be valid until the location was confirmed by the president. They took no deed at that time, but procured the Indian woman to make to one E. P. McDowell a power of attorney, authorizing him to make title in her name. That McDowell, on the 2nd April, 1838, accordingly made them a deed; but that dying immediately afterward, they were not able to complete the deed by procuring the necessary certificates of the agent and examining agent. That on the 1st of June, 1838, they procured from Ta-na-cha a confirmation of that deed, as also a deed directly from herself, having previously procured from two of the chiefs a certificate of her competency, which latter deed was proved for registration on the 7th of December, 1838. That they took possession of the land in November, 1837, and that by themselves, and those claiming under them, that possession has been continued to the present time. That defendants (claiming by virtue of a deed purporting to be from the same Indian, bearing date 31st March, 1836, and approved 13th February, 1838, by the agent representing the president,) have in-

stituted a proceeding for the recovery of the possession of the land by writ of forcible entry and detainer. They charge that this deed of the defendants is void: 1st. Because at the date of it there had been no location and approval of the reservation. 2nd. There was no certificate that the purchase money had been paid. 3rd. That at the time of signing the same, the deed was in blank, (this cannot affect it, if filled up before delivery,) and was afterwards filled up by the defendants with a full knowledge of the complainants' prior purchase and location. That the approval of the examining agent was procured by the defendants through fraud and misrepresentation in substituting one Indian for another, &c. The bill prays for an injunction against the proceeding at law, and that the defendants' deed may be declared void, and be delivered up and cancelled, &c.

To this bill there is a general demurrer. As both parties claim to derive title indirectly under the Chickasaw treaty of May, 1834, their respective pretensions must depend mainly upon a sound construction and application of the provisions of that treaty. Amongst other things, it is provided by the sixth article of the treaty, that a section of land within the territory, which was the principal subject of the treaty, should be reserved to each male and female of the Chickasaw tribe, not being the heads of families, and who were of the age of twenty-one years and upwards; a list of whom was to be made out and filed with the agent, and by him certified to the register and receiver, who was to cause such reservations to be located. The fourth article of the treaty assumes that there were many of the Chickasaw Indians who were incapable of managing their own affairs, and were subject to be imposed upon by designing men. To guard against fraud and imposition, it requires that in order to the validity of a conveyance from an Indian of his reservation, a certificate of capacity to contract, and a certificate that a fair consideration had been paid, should have been obtained, and finally an indorsement in the deed by the president of the United States, or his agent for that purpose, that the same was approved. It was said in argument, that these conditions and restrictions could not be rightly implied. The ultimate title to the lands in question being in the United States, subject to the Indian right of occupancy, it was, doubtless, competent for the two pow-

ers, in disposing of them by treaty, to fix and prescribe to their donee such form and mode of alienation as they thought fit.

The principle is well established, that the donor of a thing may annex to his gift or grant such conditions, precedent or subsequent, as he may choose, provided they be not against law. It is true, that in conveyances between private persons any conditions in restraint of the right of alienation are generally held void. But the restrictions imposed by the treaty do not come within the reason or policy of that rule; they may be said to be rather descriptive of the mode, than restrictive of the right of alienation; or perhaps they may be more properly regarded as conditions subsequent. The complainants not having complied with any of the requirements of the treaty, (except that of procuring the certificate of the capacity of their vendor,) the question arises, what title, any, did they acquire by virtue of their deed from the Indian? for if they do not show *prima facie* a good equitable title in themselves, the bill must be dismissed. The rule that the plaintiff must recover upon the strength of his own title, and not upon the weakness of his adversary's, being equally regarded by courts of law and equity—the complainants' title must depend in part upon the character of the title of their vendor at the time of the purchase. Had the Indian woman any right or title to the land in question, at the date of her sale to complainants? and was that right a legitimate subject of contract and sale prior to the completion of its location? In regard to the first branch of the proposition, I apprehend there can be no doubt. The facts that she was of the Chickasaw tribe, not being the head of a family, and of the age of twenty-one years or upwards, of themselves, gave to her, under the treaty, a right in the abstract to a section of land. The subsequent acts of enrollment and location required by the treaty, do not create the right, but merely serve to locate and attach it specifically to definite prescribed boundaries. Rutherford *v.* Green's Heirs, 2 Whea. 196. See 6th Art. Chic. T.

The second branch of the proposition is to my mind equally clear. It is now the well settled doctrine, that even a mere possibility, clothed with an interest in real estate, may be made the subject of contract, which a court of equity will inforce. Hobson *v.* Tenor, 2 P. Wms. 191; Wright *v.* Wright, 1 Ves. sr. 408. And

such possible interest may be devised by will.　3 Ed. Rep. 342; 2 Dessaus. 430.

I conclude, then, that the Indian reservation right to a section of land was the proper subject of a contract of bargain and sale, even before location was made to the extent of creating an equity in favor of the vendee, and that a subsequent location, together with a deed made in accordance with such contract and carried through the forms prescribed by the treaty, would pass the title to the vendee; and that, as between the parties themselves, and as to third persons with notice, the deed would relate back to the date of the contract for purchase. . 2 Wheat. 196.

Indeed it will appear that the acts required by the treaty to give validity to the conveyance of the Indian right, do not *precede* but *follow* the contract for purchase. The fourth article of the treaty (after reciting that there were some of the Indians incapable of managing their own affairs) proceeds thus: "It is agreed that the reservations hereinafter admitted shall not be permitted to be sold, &c. unless it appear, by the certificate of at least two (of seven persons) there designated, that the party claiming or owning the same is capable to manage and take care of his affairs; which fact, to the best of his knowledge, shall be certified by the agent, and that a fair consideration has been paid—and thereupon the deed shall be valid: provided," &c.

It will thus be seen that the Indian is not legally incapacitated to contract, in the first instance, for a sale of his reservation; but that, in order to the ratification and ultimate validity of such contract, it must pass through the forms prescribed by the treaty, as evidence of its fairness. The title passes by virtue of the deed from the Indian, and not from the United States, through the approval of its agents, as seemed to be supposed by counsel in argument. The *whole* title of the United States was parted with and ested in the Indians, to the extent of the reservations made in the treaty, and became specific and perfect so soon as the Indians were enrolled and located. The treaty requires that these titles should not be conveyed by the Indians except in the manner there provided for. These provisions were intended for the benefit and protection of the Indians only.

Having thus shown that the complainants acquired an equitable

title by virtue of the simple contract and conveyance from the Indian alone, it becomes important to inquire next whether that conveyance subsequently became void and of no effect, by reason of the complainants' failure or inability to procure the several certificates and approval required by the treaty, which they allege they were prevented from doing by the defendants fraudulently substituting another Indian of the same name to their location. As a general rule, the conveyance would be void without these formalities; but does the absence of these certificates render the deed void in all instances and under all circumstances? Do they admit of no possible excuse, nor of any conceivable substitution? I cannot so regard them. The treaty merely sought to place the Indian conveyance upon the same footing-that all other contracts repose for their validity, viz. to show that the parties were capable of contracting, and that a fair consideration passed. These are the two great objects to be advanced by the tests required by the treaty. It is the purpose of the treaty to make void those conveyances only which are attempted to be effected in total disregard of its requirements, and not those which had been fairly obtained and where the holders are honestly taking the steps in compliance with the treaty, but are suddenly retarded in their progress by accident, or wholly thwarted by fraud. Any other construction would make the treaty subversive of its own purpose, by making it instrumental in the encouragement, instead of the prevention, of fraud and imposition. Whilst it sedulously guards the Indian against fraud, its spirit is equally against permitting him, through the unconscious instrumentality of its agents, to practice fraud upon others.

Where individual rights vest under a treaty, its meaning, in reference to them, is to be ascertained by the same rules of construction and course of reasoning which we apply to the interpretation of private contracts. It must receive such construction as will best effectuate the intention. See Vattel Ch. 17.

Suppose that an Indian, entitled to a reservation, should make a full and fair sale of it, and that, while the purchaser was in the course of completing his title under the treaty, a third person, with full notice of the first sale, should seduce the Indian into a second sale, and, by concealment and misrepresentation, added to a supe-

rior race of diligence, should procure the approval and completion of his purchase, and thus forestall the first purchaser in his efforts to comply with the treaty on that subject. Does the spirit of the treaty give its approving sanction to such a transaction? Does it render the first purchase void, because of the inability of the first purchaser to do that which, by the fraud of the second, he was frustrated in and rendered unable to perform? And does it so fortify and entrench the second purchaser in his position as to render imbecile the efforts of a court of equity to apply its remedial justice? I think not. Under such circumstances, the party having a prior equitable claim would be permitted, in a court of equity, to show, by any competent testimony, the existence of these facts required by the treaty, viz: the capacity of the Indian and the payment of a fair consideration, and then the approval of the president, by which the legal title, vested in the second purchaser, should be made to enure to the benefit of the first.

The complainants' bill alleges that the defendants, with full knowledge that the land in question had been previously located in the name of their vendor, fraudulently availed themselves of said location by substituting a different Indian of the same name. Such a case is not distinguishable, in principle, from that of a person purchasing the legal estate with full notice of the prior equitable title of another, or of a subsequent purchaser having notice of a prior unregistered conveyance to a third person. In both these cases courts of equity hold that it would be unconscionable to permit the second purchaser to retain the advantage which he had thus gained. See Sugden on Vendors, ch. 16, sec. 5–10, ch. 17, sec. 12; 2 Mass. R. 506; 9 John. R. 457.

It has also been held that where a man fraudulently obtains a patent in preference to one having a prior equitable title, and this is proved, a court of equity has jurisdiction, and will afford ample relief. Benzeni *v.* Lenoir, Dev. Eq. Rep. 225; White *v.* Jones, 1 Wash. 116.

But there is another view in which the complainants may be relieved against the consequences of their failure to complete their title. The requirements of the treaty upon this subject are in the nature of conditions subsequent. Without pretending to advert to the various distinctions, upon the subject of estates upon condition,

it may be safely assumed as the rule, without qualification, that where an estate is granted upon a condition subsequent, and that condition becomes impossible by *inevitable* accident, or the performance of it is prevented by the grantor, in both cases the estate becomes absolute and unconditional. See Com. Dig. title Condition, 1, 2, 3, 4; 2 Black. Com. 156, 157; 2 Ld. Raym. 1164; 2 Atk. 18. And so I apprehend the rule would be as against a third person, by whose conduct the performance of the condition was prevented, and who is seeking to avail himself of the supposed divestiture of title.

Courts of equity never lend their aid in the divesting of an estate for even a breach of a condition subsequent, though they will often interfere to prevent such a consequence. See 4 John. Ch. R. 431; Popham *v.* Bamfield, 1 Vernon.

I conclude, then, from this view of the case—

First. That the sale by the Indian woman, even before her location was completed, gave the complainants an equitable title.

Second. That such title was not forfeited by the failure of the complainants to obtain the several certificates and approval required by the treaty; they having been prevented from doing so, as they allege in their bill, by the fraud of the defendants; and,

Third. That the complainants show such a case as *prima facie* entitles them to the relief sought by the bill.

But it was insisted by the counsel for the defendants, that, admitting the complainants to have obtained by their contract an equitable claim, which would give jurisdiction to this court, yet as the defendants have procured the title through the agency of the persons designated by the treaty, that such acts amounted to an adjudication of the title in their favor, which is final and conclusive in its nature, not subject to be overhauled or called in question by any tribunal whatever. At the hearing of the case I was strongly inclined to the same view; but, upon more reflection and examination, I think it will appear that the grounds upon which the argument proceeds are not sustainable. In the first place, it may be well doubted whether the acts of the several persons to whose scrutiny and sanction the Indian conveyance was subjected, are not purely ministerial, partaking no more of the character

16*

of a judicial sentence than the certificate of a clerk or justice of the peace of the acknowledgment of a deed.

But admitting these persons to have acted judicially, and to have possessed the highest attributes of a judicial tribunal, it becomes important to inquire, 1st. What subjects were within their jurisdiction? 2nd. Whether as between the parties to this controversy any question was adjudicated which is conclusive upon the complainants in this court? The simple questions submitted for the judgment and decision of the agents, were, 1st. Whether the Indian was competent to contract? and, 2nd. Whether he had been paid a fair consideration for his land? The adjustment of these inquiries constituted the full scope and purpose of their jurisdiction. They were not erected into a tribunal to decide upon conflicting claims arising between purchasers from the same Indian or from different Indians. Their duties bear no resemblance to those of Commissioners that have frequently been appointed by Congress with full power and for the express purpose of deciding finally upon controversies between adverse claimants, as in the case reported in 7th Wheaton. This then being the limit of their jurisdiction, it is needless to say they could have decided no question as between the parties to this controversy. They merely decided that the defendants had practiced no fraud on the Indian, he or she being competent to trade, and having received a fair consideration. They did not decide that the complainants' purchase gave them no title; or that if it did, it was not such as would prevail against the defendants. The claim of the complainants, from any thing that appears in the bill, was not before them in contest with that of the defendants. No adjudication is conclusive beyond the matter decided; nor then, unless that matter was within the jurisdiction of the tribunal making the decision.

This view of the case would be decisive of the demurrer; but as the character of the defendants is brought to view by the bill, and was ably discussed at the hearing, it may be well to advert to it;—it may seem to guide the parties in the future progress of the case. The defendants having the oldest deed, if it had appeared from the bill that their vendor is the same under whom the complainants claim according to the view which I have taken of the case, I should have had no difficulty in sustaining the demurrer

and dismissing the bill; for then the defendants would have shown both a prior equity and a legal title. The complainants allege that the defendants' deed is void, because it was in blank when it was signed; and was afterwards filled up with the designation of the land in controversy. The counsel have failed to distinguish between the effect of the signing and of the delivery of a deed. A deed takes effect by virtue of its delivery; and although it may have been in blank when signed, yet if filled up when delivered, it would be valid: but even if blank when delivered, I apprehend that objection could only be made by the grantor of the deed. It is further alleged, that the defendants' deed is void because there is no certificate that a fair consideration had been paid. I cannot admit this conclusion. The certificate of payment is not required to be indorsed upon the deed, and might have been proven in any other way; and the agent of the president having given his approval to the deed, the court is bound to presume that he had before him the evidence of a compliance with every thing which authorized his approval. The act of a public officer will be presumed to be rightly done until the contrary appears. The bill is retained then mainly with a view to the question of the alleged fraudulent substitution of one Indian for another.

The demurrer is overruled, with leave to the defendants to answer within sixty days.

From this opinion an appeal was taken to the High Court of Errors and Appeals, and the following are the briefs of counsel and the opinion of the court in that tribunal, affirming the decree of the chancellor.

W. Y. GHOLSON for appellants.

It is contended on the part of the appellants, Niles and Lewis, that the order of the chancellor should be reversed, and that the demurrer should be sustained and the bill dismissed.

1. The reservation granted to the Indian in this case, must have been under the 6th article of the treaty between the United States and Chickasaws, concluded 24th of May, 1834, and ratified 1st July, 1834. In the fourth article of the same treaty seven Chickasaw chiefs are named. By the sixth article it is made the duty

of those chiefs to make out a list of the persons entitled to reservations under the sixth article, which is to be filed with the agent and on his certificate of its believed accuracy, it is required that the register and receiver cause the reservations to be located.

2. By the same sixth article, it is expressly provided, that as to the sale, lease, or disposition of their reserves, the reservees under the sixth article are to be subject to the conditions and restrictions set forth in the fourth article of the same treaty.

3. By the fourth article it was recited that many of the Chickasaws were quite competent to manage their own affairs, but that some were not capable, and might be imposed upon by designing persons; to secure all, therefore, against fraud and imposition it was agreed, that the reservations should not be permitted "to be sold, leased or disposed of," unless it appeared by the certificate of at least two of the seven chiefs named, that the party was capable to manage and take care of his or her affairs. The same fact to the best of his knowledge and information the agent was also required to certify, and furthermore that a fair consideration had been paid; and thereupon, the treaty provides, "the deed of conveyance shall be valid, provided, the president of the United States, or such other person as he may designate, shall approve the same, and indorse it on the deed; which said deed and approval shall be registered at the place, and within the time required by the laws of the state in which the land may be situated, otherwise to be void."

4. When commissioners or other officers are appointed by treaty or law to adjust and settle land titles, their decisions within the scope of their authority are conclusive. 1 Peters, 212; Strother *v.* Lucas, 12 Peters, 412; Wilcox *v.* Jackson, 13 Peters, 511; Newman *v.* Doe ex dem. Harris and Plummer, 4 Howard, 554.

5. The general principle which has been laid down and supported by the highest authority cannot be questioned; the only inquiry will be as to its applicability to the present case. Whether the material facts set forth in the bill must not be considered as having been fully and properly adjudicated and settled by some one of the tribunals constituted for that purpose by the treaty.

6. It is objected to the deed held by Niles and Lewis, that it was not executed in pursuance of the provisions of the treaty,

being dated before the location and approval of the location, and the certificate of the agent not showing that a fair consideration had been paid, &c.   By reference to the 4th article of the treaty, it will be seen that the president of the United States, or an agent to be by him appointed, is expressly authorized to determine whether these deeds have been executed in conformity with the provisions of the treaty.   He or his agent is required to approve of the deed of conveyance; and if these words mean any thing they must certainly embrace the right to determine whether the formalities required by the treaty in relation to the execution of the deed have been complied with, and whether the deed itself be in due form.   It will be seen, too, that the certificates of the chiefs and Indian agent are not required to be indorsed on the deed; the approval of the president or his agent is required to be indorsed, and the maxim *"expressio unius est exclusio alterius"* applies with full force.   Doubtless the certificate of the chiefs and Indian agent might be presented to the president or his agent detached from the deed.   They are intended for his action only, and his approval of the deed raises a conclusive presumption that every necessary requisite has been complied with.   In this case, however, it is believed that the deed held by Niles and Lewis would bear the strictest scrutiny.   As to the date of the deed, that is a matter clearly immaterial; its operation must have reference to the time of its approval.   The certificate of the agent refers to the consideration mentioned in the deed, and states that it is fair, and the deed sets forth that the consideration has been paid.   The deed being expressly referred to in the certificate, they should be taken together, and being taken together they show not only that the consideration was fair, but that it was paid.

7. It is objected to the deed held by Niles and Lewis, that it has been obtained by fraud and misrepresentations practiced on the Indian agent.   In one aspect of this case, Niles and Lewis, and Anderson and Orne were both purchasers from the same Indian. Anderson and Orne claim to be the elder purchasers, and charge that Niles and Lewis obtained the certificates and approval by representing that there was no conflicting claim: being at the time conusant of the claim of Anderson and Orne.   That there would

be conflicting purchasers from the same Indian, must have been foreseen by the framers of the treaty. To settle this conflict, and determine which purchaser should be entitled to the land, must have been a matter within the authority of the tribunals created by the treaty. As no person could acquire a title from the Indian without obtaining the certificates and approval specified in the treaty, the giving and delivery of those certificates and approval must imply the previous decision of the question who is entitled to the land.

The series of tribunals created by the treaty must be considered as authorized to determine the legality of every step taken, up to the perfection of the title.

Was the Indian defrauded in making the contract? The recital in the 4th article shows, that, to guard against such frauds, and to settle whether the contract was fair, was the very object of giving the authority specified to the chiefs and Indian agent. But the chiefs were liable to be imposed upon. To guard against that, the Indian agent was required to indorse their certificate: and if the Indian agent, it is alleged, was liable to make an improper decision, as in this case it is alleged he did, an appeal lay to the president or his agent.

8. It is objected to the deed of Niles and Lewis, that one Indian was substituted for another, that they obtained their deed from a man, though a woman was entitled to the land.

It might be sufficient to refer to the certificate annexed to the deed of Niles and Lewis, in which the two commissioners, who may be supposed to have known the sex of the grantor in the deed, as well as it can ever be ascertained by the court of chancery, certify that Taunacha "is capable to take care and manage her affairs."

The chiefs and Indian agent were selected to carry out the provisions of treaty on account of their knowledge of the character, capacity and persons of the respective Indians, and if any one matter could be selected as being, more peculiarly than any other, within the province of the chiefs and Indian agent to decide, it would be this very question of the identity of the Indian conveying with the Indian entitled.

9. It is contended that Anderson and Orne have no interest

whatever, legal or equitable, in the subject matter in controversy, which want of interest, if it can be shown to exist, presents an insuperable obstacle to the prosecution of their suit. Story's Com. on Equity Plead. 217, 259, 389. The fourth article of the treaty above referred to, is imperative that these reservations shall not be sold, leased or disposed of, unless the certificate and approval specified are obtained; and any deed taken from an Indian, unless it be approved and registered, is declared to be void.

It has been held in the court below that notwithstanding the provisions of the treaty above referred to, it was competent for an Indian, so soon as his location was made, to make a valid contract for the sale of his reservation, and that a court of equity might enforce such contract. If it be admitted, as the bill in this case, and the opinion of the court below both admit, that the certificates and approval are requisite to the validity of the title, what reason can be given why they are not equally necessary to the validity of any contract of sale? If the treaty had used the word "conveyed," instead of "sold, leased, or disposed of," the decision must have been the same, for a contract of sale which could never be carried into effect, would surely be held nugatory and void. But the words of the treaty leave no room for implication; and unless the court is prepared to annul the positive words of the treaty, it must decide that the contract under which Anderson and Orne claim is void.

10. If the allegations of the bill be true, and can now be inquired into by another tribunal, the deed of Niles and Lewis, as to the Indian entitled to the land, is absolutely void. The prayer of the bill is that it may be declared void, and be delivered up and cancelled. The title of Niles and Lewis, then, according to the bill of complaint, being an absolute nullity, there is no prayer, and there could be no pretext, to make Niles and Lewis trustees of the legal title for the benefit of Anderson and Orne. It is true that something is said in the bill as to making Niles and Lewis trustees of the certificate. But that is absurd!

11. And any effort to make them trustees would be met by the decision of the Supreme Court of the United States, in Strother *v.* Lucas, 12 Peters, 412. The persons appointed under the treaty decided that the title to this section of land should pass to Niles

and Lewis. If the legality of that decision cannot be enquired into, then it has been decided that the title must enure to their own use.

12. The title of the said Niles and Lewis in this case has grown out of the treaty. And whenever a right grows out of, or is protected by a treaty, it prevails against all laws or decisions of the courts of the states, and whoever may have the right under the treaty is protected. 3 Dallas, 199; 1 Cond. 99; 12 Pet. 439.

G. S. YERGER for appellees.

1. It is not necessary, so far as this case is concerned, to determine whether the complainant has a title in fee or not, under his purchase from the Indian. He is in the quiet and undisturbed possession. He may protect that possession by showing that the title of the plaintiff at law is a forgery, *or is void*, and he has in equity a right to enjoin him from proceeding at law. The bill filed is to protect his possession to get at the evidence, which shows the plaintiff's title void.

The bill alleges that the deed is in fact a forgery, that one Indian of the same name was substituted for another in the deed, &c. If this be so, as the fact does not appear on the face of the deed, equity may be resorted to. Admitting that defendant in possession has no title, what right has he to be turned out of possession by one who has no title? His possessory interest, if no other, will entitle him to show this, and if he cannot show it at law, he may come into equity. It is said the act of the agent and examining agent is conclusive. They are judicial acts, &c. This is not so. If a forged or void deed is imposed on them, the right of the Indian cannot thus be divested. Such a construction put on the 4th and 6th articles of the treaty of 1834, would be inconsistent with all precedent or principle.

2. Again. If complainant's deed for want of the certificates required by the 4th article of the treaty is void; yet as he entered into possession under it, he is *quasi* a tenant of the Indian, and has a possessory right against all the world, but the Indian. He may show that the deed of defendant is void, to protect his possessory title. By the 4th article of the treaty, the certificate of the agent and examining agent is necessary to give a legal and valid

title. The bill charges that these certificates were obtained by fraud, &c. which is admitted by the demurrer. If this be so, the deed is void under the treaty. No title passed from the Indian to defendants, and they have no right to possession. See authorities cited in Mr. Clayton's brief. And it is also void because it does not certify consideration was had.

3. Again. The bill alleges that the deed was made before location and survey, and was in blank, and was afterwards filled up. This renders it void, and the title still in the Indian, under whom complainant holds. Williams *v.* Crutcher, decided this term, and cases there cited.

4. But the complainant has‘ a valid equitable interest. His purchase vested him with an inchoate right, under the treaty, which right would become complete and perfect, when he procured the certificates. The certificates were merely to confirm—the purchase or agreement to purchase necessarily preceded them. It is after the purchase is made, and the consideration paid, that they are to certify. If the certificates are not procured, the right is not complete, or perfect, and the Indian's right is not divested until they are procured or ordered by a court of equity. See 4th article of the treaty.

If, then, the purchase is made from one capable, and for a full price, the party *is* entitled to the certificates—they cannot *obstinately* and *arbitrarily* be withheld. *It was not the intention to confer arbitrary authority* on the agent and examining agent, and if they improperly and wantonly withheld the certificates, in a case where they ought to be granted, the courts by injunction or mandamus would compel them. 1 Roper's Legacies, 539.

This provision was intended to protect the Indian. The right of sale was intended to be given, and it was not contemplated that the capriciousness of the agent should deprive the Indian of the right to sell," by withholding the necessary certificates, in a case where the party was capable of contracting and got a fair price for the land.

The party, therefore, who purchases has a right, in a fair case, to get the certificates. His right is an equitable one, subject to be defeated by refusal to give the certificates in a case where the law

Anderson and Orne *v.* Lewis and Niles.

would justify the refusal. See Laws, Instructions, &c. part 2d, page 214, 124.

The party who first purchases has therefore an interest, and if another has purchased the same after him with a knowledge of his purchase, and has falsely and fraudulently imposed on the agents and obtained the certificates by fraud, he has a right to apply to a court of equity to have them cancelled, or to have him declared a trustee and make him convey his interest. In case of cancellation, he can then apply and get the proper certificates himself, and if they are refused, apply to the proper tribunal to compel it to be done. The view of the chancellor is certainly correct.

But surely if the opposers' title was obtained by forgery, or by substituting one Indian for another of the same name, and falsely procuring the certificates, he has such an interest as to have the whole transaction declared void, in order that he may complete his own title by procuring the necessary certificates.

But it is said the certificates are conclusive. That the agents are judicial officers. Suppose this be admitted. In what is their act conclusive? It is only conclusive so far as they have power to act. It is then conclusive of the fact: 1st. That the Indian was capable of managing her affairs. 2d. That the money paid was a fair consideration. 3rd. That the deed when approved is valid. But does this divest any previous interest? Suppose there are two deeds approved of. Both are valid, but which shall prevail? Suppose her grants are issued. Both are valid, but which will hold the land? But fraud vitiates grants, judgments, &c.

But again. The action of these officers does not prejudice the interest of other persons. Murray *v.* Lewis, 10 Yerger, 115. The case of Comyns *v.* Voss, 1 Peters' Rep. and the case of Strother *v.* Lucas, 12 Peters, does not conflict with, but supports the principle. Under the treaty the Indian has a right to sell, provided he had capacity, &c., and the consideration was proven sufficient. These were necessary only to confirm. If wrongfully withheld, they would be compelled. It is like a law authorizing an entry to be made in land, the title however is not perfect until confirmed by grant. If another in the mean time obtains a grant, it is not conclusive of his right, but he may be compelled to convey to the

elder enterer, as having the prior right. And the case in 12 Peters, 411, shows if the transaction is tainted with fraud, it will be set aside, &c.

In the case of commissioners of land claims, they were constituted a tribunal to adjust all conflicting claims. By an act of Congress all claims were to be recorded, all were to be laid before the commissioners, and they to decide. It is then like any other judicial sentence, conclusive upon all parties thereto; and all claimants are made parties, or may make themselves parties by filing their claims, which, if they do not, equally binds them. But suppose the compensation is obtained by fraud or perjury, will it stand? The same case decides it will not. See page 438, and authorities cited.

CLAYTON, on the same side.

The defendants object, in the first place, that the complainants have no title which authorizes them to come into a court of equity. They concede that an equitable title is sufficient for that purpose, but deny that the complainants have even an equitable title. I shall not attempt a definition which would comprehend all equitable titles; it is sufficient that an entry constitutes an equity. Cooke's Rep. 219, 238; 3 Haywood, 66, 68. So does a contract for the sale of lands. Wood v. Griffith, 1 Swanst. 55. The complainants had purchased and paid a large proportion of the money before the defendants bought; they had a written contract, such as a court of equity would enforce between parties *sui juris.* They have since paid the whole purchase money—are in possession, and ask the court to protect that possession. In a controversy between purchasers from different vendors, neither of them deducing title directly from the government, the court would entertain the bill; there is nothing in the present case calling for a different decision.

It is next objected, that the court cannot vacate the deed of the defendant upon the ground of fraud, although the complainants may have an equitable title; that the acts of the agent and examining agent, in passing upon the deed, are judicial acts; that they are final and conclusive, and cannot be reviewed or affected by this court. The principle thus laid down by the counsel of the

defendants cannot be sustained.  A court of equity has the igh t
to declare acts and instruments of every kind void for fraud,
even though sanctioned by the most solemn forms of the law.
It may for this cause avoid legislative acts.   4 Har. & McHenry,
6; judgments of courts of record;  1 John. Ch. 406;  3 John. Ch.
280;  3 Des. 268;  2 Cowen, 139;  Cooper's Equity, 96;  1 Vesey,
120;  1 Sch. & Lef. 355;  Mitford's Pleading, 84;  1 Monroe, 256;
3 Monroe, 260;  2 J. J. Marshall, 405;  1 Pirtle, 460;  Deeds or
Patents;  White *v.* Jones, 1 Wash. 47;  Jackson *v.* Lawton, 10
John. 23;  Polk's lessee *v.* Wendall, 2 Tenn. 155;  Bagnell *v.*
Broderick, 13 Peters, 436.   The exercise of this power is all that
is asked for on the present occasion.   Moreover, the acts which
the defendants claim to be judicial have no pretensions to that
character.   The title of the Indians to the lands which they occu-
py, is a right merely of occupancy or possession; they cannot,
without the assent of the government convey a title in fee simple.
They usually convey by treaty, or under the sanction of commis-
sioners appointed by the treaty or by the government.   Johnson
*v.* McIntosh, 8 Wheaton.   They are regarded as in a state of
pupilage, and the authority of the public officers, who are consti-
tuted their guardians, is necessary to a valid alienation of their
property.   3 Kent, 3d ed. 379, note;  Ib. 382.   The ratification of
a sale of his land made by an Indian, by the proper officer, is
a relinquishment of the title of the government to the purchaser.
The Indian deed, with such confirmation, operates as a grant by
the government.   Mitchell *v.* United States, 9 Peters, 756–8–9.
These general principles, illustrating the course of the govern-
ment towards the Indian tribes within its limits, are embodied in
the Chickasaw treaty.   The mode of conveying Indian titles
under that treaty is, by deed, approved by the Indian agent, as the
*guardian* of the Indians, and confirmed by the examining agent,
so as to pass and relinquish the title of the government of the
United States.   In no just sense does either of these officers exert
judicial functions in the exercise of his powers.   The Indian
deed, thus approved, becomes precisely equivalent to a grant,
invested with no other sanctity than such as attaches to grants,
and liable to all the objections which may be urged against them.
There is no doubt but that when a grant is obtained by fraud, to

Anderson and Orne *v.* Lewis and Niles.

the prejudice of the right of another, a court of equity may set it aside. Jackson *v.* Lawton, 10 John. 23; Bagnell *v.* Broderick, 13 Peters, 436; Starke *v.* Mather, Walker, 181. Again: it is said, if the court should think the complainants have a right to come into equity, it should examine the titles—that the title of the defendants will be found preferable, and that the demurrer should therefore be sustained. The priority of title is a matter which cannot be considered on this demurrer. The only question is, whether the complainants can have the fraud alleged in the bill investigated; if they can, the demurrer admits the fraud, and the further question can only arise upon the coming in of the answer. Yet, if the court should, at this stage of the cause, be disposed to weigh the titles, that of the complainants, it is thought, will preponderate. They have the elder equity, and the possession; they have a deed sufficient to pass the Indian title, but wanting the sanction of the agent or guardian, and the ratification of the examining agent, to pass the title of the government. The defendants say they ought to prevail, because they have the legal title, and had no notice of the equity of the complainants. As between conflicting entries, the doctrine of notice is utterly discarded, 13 Peters, 454, the subsequent locator cannot be considered as a purchaser without notice. Taylor *v.* Brown, 5 Cr. 236. Whether they had notice is therefore a matter of no consequence, according to the decision of the highest court. Yet they did have notice. Their deed was not approved until February, 1838. The complainants were then in possession of the land, and that was notice to the defendants of their title, whatever it was. 2 Powell on Mortgages, 576, and cases cited. Allen *v.* Anthony, 1 Merivale, 282; Chesterman *v.* Gardiner, 5 John. Ch. 33. The equity of the complainants, if notice were in question, would therefore prevail. 2 Powell on Mortgages, 452.

The bill charges, and the demurrer admits, that the Indian of whom the defendants purchased, was not enrolled or located at the time, and that he never was in fact located upon the land in controversy. The construction of the treaty by the President and the War Department, as contained in their instructions to the agent, of the 5th of February, 1836, was, that sales made by Indians before their enrolment and location, were wholly void. The

17*

words are,. "No sale of any tract can be made until the president shall have approved its location." This just principle is entirely consistent with the established law of the land. A sale of land, by one not in possession, especially if there be an adverse possession, is wholly void. Williams *v.* Hogan, 1 Meigs, 187. 4 Kent, 441. It says, if the thing granted is not in the grantor, no right passes to the grantee; the issuing of a grant is not conclusive evidence of a right in the power which issued it. New Orleans *v.* United States, 10 Peters, 663. Now it is clear that if the Indian under whom the defendants claim was never enrolled and located upon the land in question, he never had right to it; no title passed to his grantees; the confirmation by the government was a mere relinquishment of its title to the ultimate dominion or fee; and if the defendants had no valid title before from the Indian, that relinquishment could not confer title. A confirmation of a void act is of no avail, and it shall have no relation to the prejudice of another. Comyn's Dig. tit. Confirmation D. 1, 5. Lit. sec. 541.

The bill charges expressly, that the Indian of whom the defendants purchased was never located on the land in controversy; that by a fraudulent substitution of. one Indian for another, they have procured a seemingly legal title. If these facts can be established by proof, then surely the defendants' title cannot stand. If their deed be void through fraud, or for any other reason, this court has power to order it to be delivered up and cancelled. Hamilton *v.* Cummings, 1 Johns. Ch. Rep. 517; Maize *v.* Garner, Martin & Yerger, 383; Jeremy's Equity, 500. If this is done, it leaves the complainants in the enjoyment of their property, removes a cloud from their title, and gives effect to their contract.

It is therefore respectfully submitted that the demurrer must be overruled.

The opinion of the chancellor briefly sets out the facts in this cause. Case mainly depends on treaty, recites sixth and fourth articles. The various certificates intended to guard the Indians against the fraud and imposition of designing men. The ultimate title, the lands being in the United States, it was competent to the two powers to prescribe any mode of alienation to the donee. "Donor may fix any condition to his gift not against law." Restraints upon rights of alienation between private persons gener-

ally void, the restrictions by the treaty not within the rule. They may be regarded as conditions subsequent. Complainants not having complied with the requirements of the treaty in full, the question arises, what title have they? for they must recover on the strength of their own title. That title must depend in part upon the character of the title of the vendor at the time of purchase. Had the Indian *then* any right, and could that right be sold before the completion of the location? No doubt she had some right, and the enrolment and location required by the treaty merely serve to fix it to specific boundaries. Rutherford *v.* Green's, heirs, 2 Wheaton 196; art. 6, Chick. treaty. Second proposition likewise clear. A mere *possibility*, coupled with an interest in real estate, may be made the subject of a contract which a court of equity will enforce. Hobson *v.* Trevor, 2 P. Wms. 191; Wright *v.* Wright, 1 Ves. jr. 408. It may also be devised. 2 Eden, 342; 2 Dess. 430. The Indian reservation right was, therefore, before location, the proper object of bargain and sale, to the extent of creating an equity in favor of the vendee; and that a subsequent location and deed, made in accordance with such contract, and carried through the forms prescribed by the treaty, would pass the title to the vendee; and that, as between the parties themselves, and as to third persons with notice, the deed would relate back to the contract for purchase. 2 Wheat. 196. The acts required by the treaty to give validity to the conveyance of the Indian right, do not precede, but *follow* the contract for purchase. Sets out the provisions of the fourth article of the treaty. It will thus be seen that the Indian is not legally incapacitated to contract in the first instance, for a sale of the reservation; but in order to its ratification, it must pass through the forms prescribed by the treaty, as evidence of its fairness. The title passes by the Indian deed, and not from the United States through the approval of its agents. The whole title of the United States was parted with and vested in the Indians, to the extent of the reservations made in the treaty, and became specific and perfect as soon as the Indians were enrolled and located. These provisions were intended for the benefit and protection of the Indian alone. Having shown that the complainants acquired an equitable title by the contract with, and conveyance from the Indian, it becomes important next to inquire

whether that conveyance subsequently became void, by reason of the complainants' failure or inability to procure the several certificates, and approval, required by the treaty, which they alledge they were prevented from doing by the fraud of the defendants. As a general rule, the conveyance would be void without these formalities; but under some circumstances it would be good. The treaty merely sought to place the Indian conveyance upon the same footing that all other contracts repose on for their validity, viz : to show that the parties were capable of contracting, and that a fair consideration passed. These are the two great objects of the treaty. It is the object of the treaty only to make void conveyances which totally disregard its requirements, and not those fairly obtained, and where the holders honestly endeavor to comply with the terms. Any other construction would make it an instrument of fraud. When individual rights vest under a treaty, its meaning is to be ascertained by the same rules which govern private contracts. Vattel, B. 2, c. 17. If an Indian, entitled to a reservation, sells to one man, could he, while the sale was progressing through the treaty forms, sell to another who had full notice of the first sale ? I think not. Under such circumstances, the first purchaser, having a prior equity, would be permitted to show by any competent testimony, the existence of the facts required by the treaty, viz: competency of the Indian, payment of fair consideration, and signature ; and the approval of the President, by which the legal title vested in the second purchaser, would be made to enure to the benefit of the first. Such a case is not distinguishable from a purchase of the legal estate with notice of the prior equitable title of another, or of a subsequent purchaser having notice of a prior unregistered conveyance. 9. Johns, 163. 10 Johns, 457. So where a man fraudulently obtains a patent, in preference to one having a prior equitable title, a court of equity will afford relief. Benzier v. Lenoir; Dev. Equity Rep. 225. White v. Jones, 1 Wash, 116. Another view in which complainants are entitled to relief. The requirements of the treaty are in the nature of conditions subsequent. When an estate is granted upon a condition which becomes impossible by inevitable accident, or the performance is prevented by the grantor, the estate becomes absolute. Com. Dig. tit. Condition D. 1, 2, 3, 4.

Anderson and Orne *v.* Lewis and Niles.

2 Black. 156–7.  2 Lord Raymond, 1164.  2 Atk. 18.  Same rule as against a third person whose conduct prevented performance of the condition.  Courts of equity will not interfere to divest an estate for breach of condition subsequent, though they often do to prevent such a consequence.  4 Johns. Ch. 431.  1 Vernon, 83.

I conclude : 1st.  That the sale by the Indian woman gave the complainants an equitable title.  2nd.  That such title was not forfeited by the failure of the complainants to obtain the approval required by the treaty, as they were prevented by the fraud of the defendants.  3rd.  That the complainants are *prima facie* entitled to relief.

It is insisted for the defendants, that the act of approval by the agents is judicial in its character, that it is conclusive, and cannot be re-examined in any court.  The acts are not judicial, but ministerial; just as the acts of a clerk or magistrate in taking acknowledgment of a deed.  If this is not so, and the agents possess the highest attributes of a judicial tribunal, it becomes important to inquire: 1st.  What subjects were within their jurisdiction?  2nd. Whether, as between these parties, any question has been adjudicated, which is conclusive against the complainants in this court. The simple questions submitted to the agents, were: 1st.  The competency of the Indian.  2nd.  If a fair consideration had been paid.  This was the full scope and purpose of their jurisdiction. They are not like commissioners appointed to decide finally upon titles.  7 Wheaton.  The agents could not decide any thing beyond the two questions above indicated.  The claim of the complainants was not before them, and there was no controversy about it.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

The appellees exhibited their bill in chancery to enjoin proceedings in a possessory action, instituted by the appellants.  The material allegations in the bill are, that by treaty with the Chickasaw tribe of Indians, concluded on the 24th of May, 1834, certain quantities of land were reserved to the Indians.  That a certain Indian woman was duly enrolled according to the provisions of the treaty as being entitled to one section of land, which it is averred was located for her, being the land in controversy,

on the 6th day of October, 1837; and that the complainants, on the 7th of the same month, entered into a contract with the reservee for her land. Title did not then pass, but she gave a power of attorney to make a title, when her location should be duly ratified. The attorney afterwards made a title, but it was never completed by proof and registration. The Indian herself afterwards made a title, which it is admitted is not complete for want of the certificate of some of the approving agents; but it is insisted that an equitable title passed, and that complainants are entitled to protection against the title of the appellants. Complainants went into possession of the land at the time of making the contract, and still hold possession. It is admitted in the bill that the respondents have a title, but it is insisted that it was obtained by fraud, and is therefore void. The particular acts of fraud alledged are these: 1st. That the deed to appellants bears date prior to the location for the Indian, and at a time when she had no right to convey. 2d. That the agent has not certified that the purchase money was paid as required by the treaty. 3d. That the deed was blank when signed, and not filled up until after the Indian's right had been located, and after complainants had purchased, and then it was done by the appellants with a full knowledge of complainants' purchase. 4th. That the certificate of the agent was obtained by fraud and misrepresentation, in concealing from the agent the purchase of complainants, and misrepresenting the identity of the Indian under whom they claimed, falsely representing that they claimed under the woman who had sold to complainants, when their claim was derived from an Indian man. This is the outline of the bill, to which respondents demurred, and have taken an appeal from the decree of the chancellor overruling the demurrer.

Considering the allegations in the bill to be admitted by the demurrer, we might easily dispose of the case, so far as to settle this preliminary controversy, without going into an enquiry into the nature of complainants' title. Possession alone is a protection against a title obtained in fraud. But the nature of the Indian title has been discussed by counsel on both sides, and a proper respect for the arguments of counsel requires of us at least a brief review of the grounds assumed in the argument.

It is insisted that the complainants have shown no title, either legal or equitable, and that without title of some kind they cannot invoke the aid of a court of chancery, there being nothing to give it jurisdiction. To say nothing of the conclusion, we are not prepared to admit the premises. The 6th article of the treaty commences with these words: "Also reservations of a section to each shall be granted to persons male and female, not being heads of families, who are of the age of twenty-one years and upwards, a list of whom, within a reasonable time, shall be made out by the seven persons herein before mentioned, and filed with the agent, upon whose certificate of its believed accuracy, the register and receiver shall cause said reservations to be located upon lands fit for cultivation, but not to interfere with the settlement rights of others." By this language, a title in fee passed to such persons as were above the age of twenty-one. The term "reservation" was equivalent to an absolute grant. The title passed as effectually as if a grant had been executed. The same term used in the Choctaw treaty, was held to pass title, although it was then provided that a grant should issue. Newman *v.* Harris and Plummer, 4 Howard, 522. In this case, the treaty has not contemplated a further grant, or other evidence of title, showing conclusively that by the terms used it was intended that a perfect title was thereby intended to be secured. The Indian then under whom complainants claim, had in herself an absolute and unconditional title in fee simple. The title was conferred by the treaty, it was not however perfect until the location was made; location was necessary to give identity. The location it seems was duly made on the 6th of October, 1837, and thus the title to the land in controversy was on that day consummated by giving identity to that which was before unlocated. Had the Indian power to convey, and has she really conveyed to the complainants, even such right as amounts to an equitable title? Under certain restrictions she certainly had a right to convey. It is not necessary that we should enquire how far such restrictions are consistent with the character of a fee: no doubt it was competent by treaty stipulation to impose those restrictions in the present case. It has always been conceded that conveyances by Indians could only be made according to the conditions imposed by treaty. It

is not necessary in the present case to contend for an extension of that power. By the fourth article of the treaty, it is provided that the reservations made by that treaty shall not be sold, leased, or disposed of, unless it appear by the certificate of at least two out of seven persons therein named, that the party claiming the reservation, is capable of taking care of, and managing his or her affairs. This capacity must also be certified to by the agent, to the best of his knowledge or information, who is also to certify that a fair consideration has been paid, in addition to which the deed of conveyance was to be approved by the President of the United States or his agent, and to be recorded according to the laws of the state in which the land was situated. These were all conditions to be performed in order to perfect conveyance from the Indian.

It is averred in the bill that the Indian has made a deed, but that the requisite certificates have not been procured, in consequence of the fraud practiced by the appellants. The Indian then had the fee, and perhaps strictly the certificates should have been procured before a sale or conveyance, and yet there is nothing in the treaty which authorizes us on a fair construction, to consider these as conditions precedent. Suppose the Indian had conveyed and after the conveyance the requisite certificates had been procured, then of course the title would be perfect. What would make it perfect? Not the certificates alone, but first the deed and then the certificates. On procuring the certificates, the deed would relate back to the time of its date. It is to be inferred from a part of the fourth article, that the certificates were mere requisites or links in the chain of conveyance, the deed being the first step towards a complete title. This conclusion is justified by the language employed. After providing that two of the seven persons named shall give a certificate that the party is capable of managing his or her affairs, and that the agent shall also certify to the same effect, and that a fair price has been paid, it proceeds as follows: "and thereupon the deed of conveyance shall be valid, provided, the President of the United States, or such other person as he may designate, shall approve the same, and endorse it on the deed." This language seems to pre-suppose the existence of the deed before the certificates are required to be given, and that

on the procurement of the certificates, the conveyance should be complete.

The Indian then had a title to the land, and on the 7th of October, 1837, she entered into a contract to convey, and gave a power of attorney for that purpose. The attorney afterwards conveyed, but the deed was never properly proven, in consequence of which defect, the Indian herself afterwards conveyed, and her conveyance would have been perfect with the proper certificates, which the parties were prevented from procuring by the fraudulent acts of the respondents. The first step towards a perfect conveyance was performed, the subsequent steps were prevented by the respondents, to the prejudice of complainants. The equitable title is thus abundantly shewn; which I understand to be a right imperfect at law, but which may be perfected by the aid of a court of chancery, either by compelling parties to do that which in good faith they are bound to do, or by removing obstacles interposed in bad faith, to the prejudice of another. A mere entry it seems has been held to constitute an equity. Certainly a contract for the purchase of land does, when founded on a sufficient consideration, and entered into with the proper solemnity. In this case there was a contract. The title is not a complete legal title, but it can be perfected by a court of chancery, at least so far as to remove the impediments improperly interposed.

But it is further insisted, that the respective rights of the parties have undergone a proper investigation by the agents appointed for that purpose, who determined the matters before them as judicial officers, and that their decision in favor of the respondents is final and conclusive, and cannot be reviewed collaterally by any other tribunal.

These agents were not judicial officers; they were not empowered to settle and determine the rights of parties, or any right whatever. The seven persons mentioned in the 4th article, were confined in their duty to certify to a single question of fact, to wit, that the Indian who was about to sell his reserve was capable of taking care of his own affairs; and the Indian agent had only to certify to the additional fact, that a fair price had been paid. These certificates were mere preliminaries to a sale, and not even obligatory on any one, as the President still had the power to approve or

disapprove the sale.   The agents were ministerial officers ; but if their powers were judicial it would not alter the case.   Any act, however solemn, even though it be a judgment of a court of competent jurisdiction, may be set aside, if procured by fraud.  1 J. C. Rep. 406 ;  Mitford's Pleading, 128, and note.   Fraud vitiates every thing into which it enters.  But it is insisted that this question of fraud must have been investigated and decided on by the agents. The history of the case leads to no such conclusion, nor do the certificates justify such inference.   Fraud in the procurement of these certificates is charged directly and circumstantially.   It was fraudulent to procure the agents' certificate under a representation that there was no conflicting claim, knowing that the complainants had purchased in good faith.   It was fraudulent to procure a certificate by substituting one Indian for another.   If the bill is true, these are questions which could not have been decided by the proper agent.   The very ground of the charge is, that the agent himself was imposed upon and deceived.   This position is therefore untenable.

It is frequently the case that different modes of defence may be adapted to different parts of the bill, but if it contain an allegation of fraud, it is a general rule that the allegation of fraud must be denied by answer, whatever defence may be adopted as to the other parts of the bill ; because fraud gives jurisdiction to the court and lays a foundation for relief, hence a general demurrer to a bill containing such an allegation cannot be allowed.   So if the defendant should plead to the bill, he must still deny the fraud by answer as well as by averment in the plea.   Mitford's Pleading, 239—298.   An application of this rule to the case before us must show the impropriety of the demurrer, so far at least as the allegation of fraud is to be met by it.   The demurrer admits that the deed was filled up long after it was executed ; that the certificates were procured by fraud and misrepresentation ; that one Indian was substituted for another ; and certainly, with such facts admitted, a court of chancery could not hesitate to entertain jurisdiction and give relief.   Decree affirmed.