ALBANY,
February, 1809.

Grant
v.
M'Lachlin.

GRANT AND SWIFT *against* M'LACHLIN.

An *American* vessel was captured by a *French* privateer, and carried into *Porto Rico*, a *Spanish* port, and from thence to *Samana*, where she was put in requisition by the *French*

THIS was an action of *trover* for a vessel, called the *William*, of *Hallowell*, *Kennebeck*. The cause was tried at the sittings in *New-York*, on the 24th *December*, 1807, before Mr. Justice *Spencer*.

In the autumn of the year 1804, the plaintiffs were owners of the vessel in question, and in *November*, 1804,

government and sent to *Barracoa*, where she was dismantled and abandoned. The vessel having stranded on the beach, was, some months after, sold at auction, by the commanding officer of the port, and purchased by an *American*, who, afterwards, repaired her, at great expense, and brought her to *New-York*, where she was claimed by the original owner. In an action of *trover* brought by the original owner, it was held, that the vessel being abandoned, and a wreck, and having been sold by the government at *Barracoa*, according to the laws of *Spain*, in cases of wreck or derelict, the property was transferred by the sale to the purchaser, who thereby acquired a valid title against all the world.

sent her on a voyage from the *United States* to the *West-Indies*. *Swift,* one of the plaintiffs, was master. During the voyage, the vessel was captured by a *French* privateer, and carried into *Porto Rico,* a *Spanish* port. It appeared from the testimony of the mate, that the *Spanish* government refused to take any steps for the trial and condemnation of the vessel. The mate went afterwards to *St. Domingo,* and there made protest against the captors. The governor-general, *Ferrand,* declared, that the vessel should be delivered up within three days after her arrival there. The captors took the vessel to *Samana,* a small island on the N. E. side of *St. Domingo,* then under the *French* government, and there discharged her cargo. The vessel was put in requisition by the *French* government, to carry 140 passengers to *Barracoa,* where she arrived in *February* or *March,* 1805, in a dismantled condition, under the command of a captain *Lannois.* About two months after her arrival, she was abandoned by *Lannois,* who went to sea in a *French* privateer. The vessel lay 9 or 10 months, without any person on board ; all her sails, rigging, blocks, masts and spars, except the bowsprit, were taken away, and she was used as a hulk by which to heave down vessels. Her cables, having become rotten, parted, and she was driven on shore, where she lay with four feet of water in her hold, at high water.

The defendant in *November,* 1805, purchased the vessel at *Barracoa,* for 54 dollars, where she was sold by order of the *Spanish* commissary, with several other old vessels, at auction ; she was got off and repaired, and arrived afterwards at the port of *New-York,* having changed her name, where the plaintiffs found and demanded her of the defendant, who refused to deliver her up. It appeared from the testimony, that 50 dollars was the value of the vessel, at the time she was sold at auction ; and that the defendant laid out near 2,000 dollars in repairing her. Several witnesses, who had been at *Barracoa,* and professed to be acquainted with the laws there, testified, that by the laws of *Spain,* any vessel which had been abandoned, and

ALBANY,
February, 1809.

Grant
v.
M'Lachlin.

become derelict, might in 24 hours after, be sold by the king's agent and commissary, as a *droit* of the king.

The defendant's counsel produced a certificate in the *Spanish* language, which was objected to on the part of the plaintiffs ; but a translation of it was read, by consent, reserving all questions as to its admissibility. It was as follows :

" I, *Louis Ann de Aleivar*, lieutenant in the royal marine, military commandant of this city and its jurisdiction, king's port-captain, CERTIFY, that the register of the port proceedings in my charge, records, that on the 17th day of *March*, last year, there arrived at this port from *Samana*, in the island of *St. Domingo*, the *American* schooner *William*, having on board 140 passengers, black and white, with some plank and staves ; and that the captain and supercargo, *John Joseph Lannois*, abandoned the hull of the said vessel, leaving it stript, wanting cables, and funds to meet the expenses, as he declared the same, at this office, having sold the little that remained of the sails, cordage and other effects of the said schooner ; and that it may have faith before whomsoever it may be brought, I grant the present declaration to captain *P. M'Lachlin*, who has satisfied me in paying to this office 54 dollars for the purchase of the said hull of the said vessel, so abandoned and stranded on the beach of this port. City of our Lady of Assumption, *Barracoa*, 8th *January*, 1806.

Signed

" *Louis Anne.*"

To this paper was attached the certificate of a notary at *Barracoa*.

The *Spanish* consul at *New-York*, and the *American* consul at the *Havanna*, were called as witnesses, and testified, that by the laws of *Spain*, which have equal force in the *Spanish* colonies, a vessel found stranded and deserted on the coast, might be sold for the benefit of the owners, and the proceeds carried to the royal treasury, and if not claimed in a certain time, belonged to the crown ; that the proper officer may sell at public auction, without any other

proceeding, than two or three days' notice of the sale, which is not in the nature of a monition, nor is any proceeding of a judicial nature requisite to try the fact whether the vessel be derelict or not ; that the *Spanish* document produced was conformable to the laws of *Spain*, and would be received as evidence of the truth of the facts contained in it, in any *Spanish* court ; that courts of admiralty were established in the colonies as well as in the mother country, which were governed by the law of nations, and had the same jurisdiction as courts of admiralty in other countries. The value of the vessel, before she sailed to the *West-Indies*, and at the time of the demand and refusal, was proved.

The jury, under the direction of the judge, found a verdict for the plaintiffs, subject to the opinion of the court ; that if the court should be of opinion that the plaintiffs were entitled only to the value of the vessel as she was bought at *Barracoa*, then they assessed the damages at 54 dollars, and if the court should be of opinion that the plaintiffs were entitled to recover the value of the vessel at the time of the demand and refusal, then they assessed the damages at 2,300 dollars ; but if the court should decide that the plaintiffs were not entitled to recover, then judgment was to be entered for the defendant.

*Colden*, for the plaintiffs. The question is, whether the property in the vessel has been changed. Personal property can be transferred only by the consent of the owner, or by operation of law. The consent of the owners is not pretended. Admitting, that, by the laws of *Spain*, the property, under the circumstances of the case, might have been changed ; yet there is no evidence that the sale has been made according to the laws of *Spain*. All the witnesses, except the *Spanish* consul, who have deposed as to the laws of *Spain*, speak from hearsay, and are not agreed as to the time the property is to remain derelict. To render a vessel a *derelict*, she must have been abandoned without any intention on the part of the owner or his agents to return to her. One of the witnesses states, that he went to *Barracoa* for the express pur-

pose of reclaiming her, and, from the time the vessel was first captured, the captain and mate were in pursuit of her. A *wreck* is where a vessel is driven on shore by the sea, and lost or abandoned. If pirates take a ship and turn her adrift, and she is cast on shore, this is not such a wreck as to render it a *droit* of the king.*

* *Hargrave's Law Tracts*, 38. 2 *Inst.* 167.

It is well known, that *Spain* has a regular code of maritime laws,† and the law of that country, in cases like the present, ought to have been clearly and satisfactorily shown, by proper documents, to the court. The defendant is bound to make out and exhibit a clear and legal title.‡

† 1 *Azuni*, 405. (*Johns. Transl.*)

‡ 4 *Rob. Adm. Rep.* 284. in note.

Again, the vessel was either a regular prize, or taken by pirates. If taken by pirates, the property was not changed.§ If she was a prize, she ought to be regularly condemned in the court of the captors, and the purchaser should show his title under that condemnation.**

§ 2 *Azuni*, 362. (*Johns. Transl.*)

** *Doug.* 594. 1 *Rob. Adm. Rep.* 134.

As to the amount of damages, the true rule is the value of the vessel at the time of the demand and refusal. If the defendant has laid out money in repairs, it was done at his peril, and the plaintiffs must acquire the benefit of them, by right of accession.††

†† 2 *Bl. Com.* 48.

*Harison*, contra. It is true, that where a person claims under a capture, he must show the condemnation.‡‡ But here the property is not claimed by a right derived under a capture. The case does not proceed on the law of nations, or the *jus belli*, but on the law of a particular country. A sale by the sovereign of a country is always sufficient to change the property. It is enough that, by the municipal laws of the country, the sale was so conducted as to transfer the property. Such a sale must be binding, and protect the purchaser in his possession. A British vessel was captured by the Algerines and sold, according to the practice at *Algiers*, and such sale was held to be valid in *England*.§§ If a vessel wrecked or stranded on our coast, should be sold in order to prevent a total loss, such a sale would be valid; and should the purchaser, afterwards, repair her, and proceed to the port where the original owner resided, he

‡‡ *Abbott*, 8, 9, 10.

§§ *Helena*, 4 *Rob. Adm. Rep.* 3.

could not be divested of his property, by any claim of the former owner.

The Spanish consul declared, that the proceedings were conformable to the laws of *Spain*, and that the written document held by the defendant was sufficient to transfer the property. This was confirmed by the testimony of the American consul at the *Havanna*. If the owner or agent had appeared and claimed the vessel, the Spanish officer at *Barracoa* would, no doubt, have delivered her to him; but as no claimant appeared, he was perfectly justifiable in ordering her to be sold.

If, however, the plaintiff should be considered as entitled to recover, the rule of damages contended for by the plaintiff is wholly inadmissible. It may be applicable in some cases, *in odium spoliatoris;* but in the case of an innocent and *bona fide* purchaser, who has laid out his money and brought the vessel home, such a rule can never be endured. Had the defendant libelled the vessel here for *salvage*, would he not be entitled to all the money expended for repairs, and to enable him to bring the vessel in safety to the *United States?* If the plaintiffs have had their property taken from them by pirates, they must seek their remedy against the pirates. If their vessel has been illegally captured, they must have recourse to the government for redress. The defendant having acquired a fair title under the laws of *Spain*, has a right to retain the vessel against all the world.

THOMPSON, J. delivered the opinion of the court. The first question which this case presents is, whether the plaintiffs are entitled to recover; and the conclusion to which I have arrived on this point will render it unnecessary for me to examine the second question made on the argument, which relates to the rule of damages.

The capture of the vessel by the *French* privateer was no doubt illegal; and as the captors never brought the subject to a trial, nor obtained any judicial condemnation, but violently appropriated the vessel to their own use, the title of the plaintiffs was not lost by these irregular and piratical

proceedings. The only question is, whether the sale by the Spanish officer at *Barracoa* did not transfer the property to the defendant. The proceedings at *Barracoa* appear to have been fair and *bona fide*, both as to the sale and purchase; and if the sale was made pursuant to the laws of *Spain*, I think the plaintiffs are concluded by it. Whether the property so sold had been previously acquired by piracy, or otherwise, does not appear to me to be a material inquiry. Goods taken from pirates, and belonging to others, will, under the English law, be taken and sold by government, if the owner comes not within a reasonable time to vindicate his property. What that reasonable time shall be, every government will determine for itself. A sale according to the law of the place where the property is, must vest a title in the purchaser, which all foreign courts are bound, not only from comity, but on strong grounds of public utility, to recognize. Without this rule, there could be no safety in derivative titles. The only inquiry in these cases is, was the sale under a competent authority? Here was a vessel brought into a Spanish port by Frenchmen. She appears in a feeble and dismantled condition. After two months, she is abandoned by her former possessors, who brought her there. She remains in that situation for several months, and is, at last, cast on shore. Then the public agent, and commissary of the port, caused her to be sold at auction, and the defendant became the purchaser. The weight of evidence is, that this proceeding of the officer was agreeable to the laws and usages of *Spain* and her colonies, and I see no reason why a good title did not pass by the sale. This is not a case of prize, or title founded on capture. Such cases are governed by different rules, and must be tested by the law of nations. The sale in this case was a proceeding under a municipal regulation, and every government prescribes its own rules relative to wrecks, and property left derelict. By the English law, vessels cast on shore and abandoned, and not reclaimed within a year, are to be sold by a public officer, and the proceeds placed in the hands of the government. We

have a similar statute in this state, and I believe it was ne-
ver doubted but that the purchaser would obtain a valid
title, which would be every where respected. These sales
are usually summary, and the presumption ought to be
liberal in favour of their regularity and competency, when
no doubt is raised as to the fairness and official nature of
the transaction.

We are, accordingly, of opinion, that judgment must be
given for the defendant.

Judgment for the defendant.